# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 93 C 7637 |
| ) | |
| WAUCONDA SAND & GRAVEL CO., ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Before the court is the motion of the United States to enforce, as to defendant Wells Manufacturing Company ("Wells"), the consent decree entered in this action in 1994. For the following reasons, the motion is granted.

## BACKGROUND

The Wauconda Landfill Site is a 74-acre property in the Village of Wauconda, Illinois. Prior to 1941, the site was a sand and gravel pit. From 1941 until it was closed by the Illinois Environmental Protection Agency in 1978, the site was operated as a landfill that received municipal, residential, commercial, and industrial wastes. When it was closed, the landfill was covered with a layer of soil and clay, known as a "cap," which was intended to keep precipitation from entering the landfill and generating leachate, contaminated water flowing out of the site.

After an investigation in 1983, the United States Environmental Protection Agency (the "EPA") placed the Wauconda Landfill Site on its National Priorities List, which is maintained pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and identifies sites most in need of long-term remedial evaluation and response. (Once a site is placed on the List, the EPA conducts (or requires potentially responsible parties--PRPs--to conduct) an investigation to define the nature and extent of the threat posed by the release of a hazardous substance and to evaluate proposed remedies. The EPA then publishes a proposed plan for remedial action and provides an opportunity for public commentary. After reviewing comments, it selects a remedial action by issuing a Record of Decision ("ROD").) When the Wauconda Landfill Site was investigated, several hazardous substances were found to be present. In addition to arsenic, benzene, and other hazardous substances, vinyl chloride, a known carcinogen, was detected in groundwater samples from wells located both on- and off-site. In several instances, on-site concentrations of vinyl chloride exceeded the maximum contaminant level ("MCL") established by the EPA to protect drinking water, and in one instance, the off-site concentration of vinyl chloride exceeded the MCL. (Gov't's Mem. in Supp. of Mot., Ex. 2, 1989 UAO, at 14-15.)

On March 31, 1989, the EPA issued its final ROD for the

Wauconda Landfill Site. The ROD called for improvements to the cap; long-term groundwater monitoring, both inside and outside of the site's boundaries; continued operation and maintenance of the site cap and the leachate collection system; and several other remedial measures. (Gov't's Mem. in Supp. of Mot., Ex. 1, 1989 ROD at 39.) The ROD also set "action levels" for concentration of contaminants, including vinyl chloride, the exceedance of which would trigger further investigation, evaluation of alternatives, and the possible reopening of the ROD. (1989 ROD at 41-42.)

Shortly after the ROD was issued, the EPA issued a Unilateral Administrative Order ("UAO") pursuant to § 106(a) of CERCLA, 42 U.S.C. § 9606(a), that required seventeen respondent PRPs, including defendant Wells, to undertake the remedial activities set forth in the ROD pursuant to a Scope of Work ("SOW") for implementation of specific tasks. Among many other things, the UAO required that the respondents conduct further investigation and/or work if groundwater contamination was found to exceed certain levels. (1989 UAO at 27, 30.)

The SOW, for its part, provided that if hazardous substances from the Wauconda Landfill Site exceeded one of the action levels specified in the SOW, and the EPA determined that further investigation or alternative evaluation tasks were needed to determine the extent of the hazard presented and to evaluate remedial alternatives, the EPA would discuss it with the

respondents and would possibly require additional investigation and study pursuant to a plan and schedule. The respondents would then be required to implement the investigation and study in accordance with the plan and schedule approved by the EPA. (Gov't's Mem. in Supp. of Mot., Ex. 3, Scope of Work, Attachment B to UAO, at 14.)

After the 1989 ROD and UAO were issued, a group of PRPs formed the Wauconda Task Group ("WTG"), which at the time included Wells, to perform the required cleanup. Cleanup began. In 1993, the United States brought the instant action for recovery of cleanup costs against the members of the WTG (or their successors), the PRPs who had been respondents to the UAO. We entered the Consent Decree at issue in this motion on April 20, 1994 (the "1994 Consent Decree"). In the 1994 Consent Decree, the Settling Defendants, including Wells, agreed to reimburse the government for certain "Past Response Costs" incurred by the government in the cleanup, all "Oversight Costs" associated with governmental supervision of the cleanup, and all costs the government incurred in enforcing the decree. (Gov't's Mem. in Supp. of Mot., Ex. 5, 1994 Consent Decree, at 6-8.) In exchange, the government agreed not to sue the Settling Defendants for reimbursement of additional past response costs incurred at the site, provided that the Settling Defendants fully complied with their obligations under the Decree. The Decree states that the Settling Defendants are jointly and severally liable to the government for payment of the specified costs. (1994

Consent Decree ¶ 14.)

In 1996, the WTG completed the remedial tasks specified in the 1989 UAO. Since completion, the WTG has conducted operation and maintenance of the remedy at the site as required by the 1989 UAO and 1994 Consent Decree, which includes the collection of groundwater samples both on- and off-site. The EPA has conducted five-year reviews of the remedial action since 1996.

In late 2003, while the remedy was in the operations and maintenance phase, the Lake County Health Department conducted routine monitoring of residential well-water quality and detected vinyl chloride in wells near the site. Three of the wells contained vinyl chloride at levels that exceeded the EPA's MCL for that pollutant (which is 2.0 parts per billion, or ppb). At the EPA's request and with its oversight, the WTG conducted additional sampling of residential wells in 2004 and detected vinyl chloride in 81 of 125 wells, although none exceeded the MCL. (Gov't's Mem. in Supp. of Mot., Ex. 4, Third Five-Year Review at 18-19.) Based on the discovery of vinyl chloride in the groundwater, the EPA issued a UAO in September 2004 to the WTG members and the Village of Wauconda. In a series of correspondence, the EPA stayed the effective date of the 2004 UAO while it considered an appropriate course of action.

In July 2005, the EPA issued a bill to the WTG, of which Wells was a member at the time, for $331,045 in past Oversight Costs

under the 1994 Consent Decree for the period from May 1, 2004 through April 30, 2005 (the "2005 Bill").  Negotiations then proceeded among the 1994 Settling Defendants regarding apportionment of their relative shares of the costs, their future obligations related to the site, and settling with the government.  Wells did not reach an apportionment agreement with the other Settling Defendants and ultimately declined to join the negotiations between those parties and the government.

The government eventually settled with most of[1] the other 1994 Settling Defendants, and in February 2009 a consent decree (to which Wells is not a party) was approved and entered by Judge Lefkow in <u>United States v. BFI Waste Systems of North America, Inc.</u>, 07 C 4499.  The 2009 Consent Decree incorporates the obligations of the 1989 UAO and 1994 Consent Decree and requires the 2009 Settling Defendants to connect 381 homes to the Village of Wauconda municipal water supply, increase the capacity of the water works, and set up a comprehensive perimeter groundwater monitoring system.  It also requires them to pay $31,045.84 for past response costs.  The goverment agreed not to sue the 2009 Settling Defendants for past and future response costs.  The covenant not to sue applies only to the 2009 Settling Defendants and not to Wells.

In September 2009, the EPA sent Wells a bill for $364,236.71

---

[1] A few of the 1994 Settling Defendants were not parties to the 2009 Consent Decree but entered into separate agreements with certain other 1994 Settling Defendants to resolve their respective shares of liability.

in Oversight Costs incurred during the period from May 1, 2004 through April 30, 2005, which included additional charges and adjustments that did not originally appear on the 2005 Bill to the WTG (the "2009 Bill"). The amount is calculated from the total remaining unreimbursed costs of $395,282.55 incurred during the relevant period, less the $31,045.84 in costs reimbursed by the 2009 Settling Defendants under the 2009 Consent Decree. Wells received the bill but to date has failed to pay. The government moves for entry of an order enforcing the 1994 Consent Decree and requiring Wells to pay the outstanding costs identified in the 2009 Bill, $364,236.71, plus interest and the costs of enforcement.

## DISCUSSION

Consent decrees have attributes of both contracts and judicial orders. Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 519 (1986); King v. Walters, 190 F.3d 784, 788 (7th Cir. 1999). They are "particularly appropriate in environmental litigation, for they avoid lengthy and complicated proceedings on issues that might extend beyond the institutional expertise of judges and juries . . . [and] provide for efficient enforcement and implementation of environmental standards by a single court." United States v. Moore Am. Graphics, Inc., No. 84 C 6547, 1989 WL 81799, at *3 (N.D. Ill. July 10, 1989). "Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced."

O'Sullivan v. City of Chicago, 396 F.3d 843, 867 (7th Cir. 2005) (brackets omitted).[2]

The government contends that Wells is in violation of the 1994 Consent Decree for its failure to pay the costs identified in the 2005 and 2009 Bills, which are Oversight Costs as defined in the Decree. The government cites Wells's agreement to be jointly and severally liable for "all Oversight Costs and all costs incurred in enforcing [the] Decree not inconsistent with the National Contingency Plan incurred by the United States after March 31, 1992." (1994 Consent Decree ¶ 9.)

Wells concedes that under the 1994 Consent Decree, it is liable for Oversight Costs incurred for the work required under the 1989 UAO. It argues, however, that the EPA "decided to issue the 2004 UAO so that it could not only get the WTG to conduct additional work but also recover its costs in overseeing such work" and that any costs "associated with the development of and eventual negotiations with respect to the 2004 UAO and 2009 Consent Decree are not recoverable under the 1994 Consent Decree." (Def.'s Resp. at 8.) According to Wells, the groundwater investigative work that the WTG performed in 2004 did not indicate an exceedance of the vinyl chloride MCL, so the EPA cannot use the 1989 UAO as the basis

---

[2] Moreover, the 1994 Consent Decree provides that this court "retains jurisdiction of this matter for purposes of interpreting, implementing, and enforcing" the Decree, and the parties agreed to be bound by its terms and not to contest its validity in any subsequent enforcement proceeding. (1994 Consent Decree ¶¶ 24, 1.)

for requiring additional *remedial* groundwater work and recovering the associated costs. (Def.'s Resp. at 7.) In Wells's view, the 1989 UAO and 1994 Consent Decree enable the government to recover only the costs of additional groundwater *investigative* work, and it requests us to direct the EPA to "identify those costs related to overseeing the 1989 UAO work included in its 2009 Demand so that Wells can determine which costs it should properly pay as required under [its] obligation under the 1994 Consent Decree." (Def.'s Resp. at 9.)

As an initial matter, we will address the 2004 UAO. Although it was issued, the EPA stayed its effective date many times pending negotiations with the other 1994 Settling Defendants. Ultimately, that UAO never took effect. And as the government correctly notes, even if it had taken effect, there is nothing in it or in the 2009 Consent Decree (to which Wells was not a party) that supersedes or limits the government's authority to pursue *Wells* under the 1994 Consent Decree. So the 2004 UAO is a red herring; it does not affect Wells's liability to the government. The government does not seek to recover costs from Wells pursuant to that order, but rather under the 1994 Consent Decree and the 1989 UAO. Therefore, we look to the plain language of the 1994 Consent Decree to determine what costs are recoverable from Wells.

As discussed above, the 1994 Consent Decree provides that the Settling Defendants, including Wells, shall reimburse the

government for all "Oversight Costs" and all costs incurred in enforcing the Decree. (1994 Consent Decree ¶ 9.) The term "Oversight Costs" is defined as "any costs not inconsistent with the National Contingency Plan[3] incurred by U.S. EPA in monitoring the compliance of the Settling Defendants with th[e] Consent Decree and overseeing Settling Defendants' compliance with the terms of the [1989] UAO, including but not limited to, payroll and other direct costs, indirect and overhead costs, sampling and laboratory costs, travel and contractor costs." (1994 Consent Decree ¶ 4, at 4-5.)

Did the government incur the costs at issue in monitoring and overseeing the Settling Defendants' compliance with the 1989 UAO? First, we examine the 1989 UAO to determine what it required of the Settling Defendants. In pertinent part, to comply with the 1989 UAO, they were required to conduct groundwater monitoring to ensure "that the concentration of hazardous substances in groundwater beyond the borders of the Site shall not exceed MCLs or other health based criteria identified in the ROD," and in the event that groundwater contamination exceeded these levels, to conduct "further remedial investigation and/or remedial activities, as set

---

[3]/ The 1994 Consent Decree provides that the "National Contingency Plan," or "NCP," is "the term used in Section 105 of CERCLA, 42 U.S.C. § 9605." (1994 Consent Decree ¶ 4, at 4.) The NCP "outlines specific steps the government must take before and during its response efforts." United States v. Saporito, No. 07 C 3169, 2011 WL 2473332, at *1 (N.D. Ill. June 22, 2011). "Governmental cleanup activities and their attendant costs are presumed to be consistent with the NCP, and the responsible party bears the burden of proving otherwise." Id. (citations omitted). Wells does not assert that the costs incurred by the government were inconsistent with the NCP.

forth in the SOW . . . to attain such levels." (1989 UAO at 27.) The UAO also provides that if long-term monitoring and inspection reports indicated that hazardous substances from the site exceeded one of the action levels described in the SOW,

> further investigative and/or feasibility study tasks may be determined to be necessary by U.S. EPA and shall be implemented by the Respondents in accordance with the SOW. If an applicable action level is exceeded in a residential well, actions shall be taken by the Respondents to provide an alternative water supply to the affected residents in accordance with the SOW and a written directive from U.S. EPA.

(1989 UAO at 30.)

The SOW specifies certain action levels, the exceedance of which authorized the EPA to require further action by the Settling Defendants. The EPA could require the Settling Defendants to conduct further investigation and evaluation of alternatives in accord with a plan and schedule approved by the EPA if the representative concentrations sampled in an off-site residential well exceeded the MCL for that pollutant in drinking water (2.0 ppb for vinyl chloride), or if a certain cumulative carcinogenic risk level was exceeded. (SOW at 14.) The EPA could also require residential well re-sampling where results from residential wells that were not part of the quarterly sampling program showed levels of compounds that exceeded one-half of the MCL. For vinyl chloride, one-half of the MCL is 1.0 ppb. (SOW at 6.)

The Third Five-Year Review report for the site, which was issued in August 2007, states that in September 2003, vinyl

chloride was detected in a residential well east of the site at a level well above the applicable 1.0 ppb action level. (Third Five-Year Review at 18.) Subsequent sampling of residential wells in the latter part of 2003 showed vinyl chloride in three wells at levels that exceeded 2.0 ppb. (Gov't's Mem. in Supp. of Mot., Ex. 12, Declaration of Sheri Bianchin ¶ 11; Ex. 6, 2004 UAO, at 4-5.) Even if the *WTG's* follow-up sampling in 2004 did not show vinyl chloride levels that exceeded the MCL, there is no doubt that in 2003, action levels for vinyl chloride were exceeded in some residential wells. Wells submits no evidence to the contrary. The EPA accordingly had the authority under the 1989 UAO to require the Respondents to conduct further investigation and evaluation of alternatives. The terms of the UAO also required the Respondents to provide an alternative water supply to affected residents.

The final question is whether the costs that the government seeks to recover were incurred in its oversight of the Settling Defendants' investigation and evaluation of alternative courses of conduct regarding the vinyl-chloride groundwater contamination or in its oversight of the provision of an alternative water supply. One of the exhibits submitted by the government in support of its motion is the Declaration of Sheri Bianchin. Since 2009, Bianchin has been the EPA's Remedial Project Manager assigned to the Wauconda Landfill Site; she is responsible for coordinating, monitoring, and directing the remedial actions conducted there.

Bianchin states that she is personally familiar with and has reviewed a number of the documents pertaining to cleanup activities at the site (and lists those documents), among them the cost documentation package for the site for the period from April 30, 2004 through May 1, 2005. She further states:

> In its oversight of the response actions at the Wauconda Sand and Gravel Site between April 30, 2004 and May 1, 2005, U.S. EPA incurred costs for technical services rendered by several contractors. These costs were incurred by U.S. EPA to determine whether additional investigation and remedial actions were needed to address the vinyl chloride contamination surrounding the Site. Thus, these costs were incurred in overseeing the Respondents' compliance with the 1989 UAO, which authorizes EPA to require additional investigation and remedial action in the event that certain action levels identified in the UAO are exceeded. In other words, U.S. EPA could not properly determine what additional actions would be required of the Respondents without incurring the costs on the 2009 Bill.
> . . .
> The costs in the Itemized Cost Summary in the 2009 Bill were incurred by U.S. EPA in overseeing the implementation of the 1989 ROD and 1989 UAO. These costs relate to monitoring contamination of the groundwater in the area surrounding the Site, and the migration of pollutants in groundwater and surface water from the Site. This groundwater and surface water monitoring is required under the 1989 UAO. All such activities, and associated costs, are consistent with the National Contingency Plan.

(Bianchin Decl. ¶¶ 12, 22.) In the declaration, Bianchin explains, in detailed fashion, the nature of the costs incurred by the EPA during the relevant period. They include costs for oversight of groundwater sampling, laboratory analysis, and data review; aerial photographic analysis to identify other potential sources of vinyl chloride contamination; communication with the public and

preparation of a community involvement plan; preparation of technical reports; and document management. (Bianchin Decl. ¶¶ 13-20.) In addition to contractor costs, the EPA incurred payroll costs for tasks performed by its employees that related to all of these activities. (Bianchin Decl. ¶ 21.)

We conclude that the costs sought by the government were incurred in its oversight of the 1994 Settling Defendants' investigation and evaluation of alternative courses of conduct regarding the vinyl-chloride groundwater contamination. Wells's request that we "require USEPA to identify those costs related to overseeing the 1989 UAO work," Def.'s Resp. at 9, is denied because the government has already submitted sufficient evidentiary support for its oversight costs through Bianchin's Declaration, and Wells fails to submit any evidence to contradict the Declaration.

Wells, which is jointly and severally liable for Oversight Costs under the 1994 Consent Decree, will be ordered to pay the outstanding Oversight Costs, which are $364,236.71. The 1994 Consent Decree provides that outstanding payments "shall be assessed interest from the date upon which such payment was due at the rate provided in 28 U.S.C. § 1961(a), and such interest shall

be compounded each federal fiscal year."[4] (¶ 11.)[5] It also provides that if the government brings an action against any Settling Defendant to collect any past-due amounts due under the decree, that Settling Defendant shall reimburse the government for all costs of the action, including but not limited to attorney's fees. (¶ 12.) Therefore, in addition to the outstanding Oversight Costs, Wells will also be ordered to pay interest and costs as specified in the 1994 Consent Decree.

## **CONCLUSION**

For the foregoing reasons, the motion of the United States to enforce the consent decree entered in this action on April 20, 1994 and to order Wells Manufacturing Company to reimburse the United States Environmental Protection Agency for $364,236.71 in costs incurred in connection with the clean-up of the Wauconda Sand and Gravel Superfund Site plus interest and costs of enforcement [24] is granted. The parties are directed to confer and informally attempt to agree on the appropriate amount of attorney's fees.[6] If, by November 28, 2011, they have not been able to agree, then they should follow the procedure outlined in Local Rule 54.3 (and

---

[4] The 1994 Consent Decree states that payments for Oversight Costs are due within thirty days of the government's submission of the claim. (¶ 10.)

[5] At footnote 12 of its memorandum in support of its motion, the government indicates that for simplicity, with respect to the 2005 Bill, it seeks interest only on contractor charges in that bill. It seeks interest on all charges in the 2009 Bill.

[6] This is without prejudice to Wells's position that no fees are owing because no reimbursement is owing.

the schedule set forth in that Rule shall run from November 28, 2011 instead of today's date). In the event that the parties do reach an agreement regarding fees by November 28, the government is directed to submit a proposed judgment order by December 2, 2011.

DATE: November 7, 2011

ENTER: _____
John F. Grady, United States District Judge